**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOSE MANUEL BAEZ CRUZ, | CASE NO. 1:25-CV-01169-BYP |
| Plaintiff, | DISTRICT JUDGE BENITA Y. PEARSON |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Jose Manuel Baez-Cruz seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **AFFIRMED**.

## I.     Procedural History

Mr. Baez-Cruz filed his DIB application on November 16, 2021, alleging disability

beginning August 5, 2020.[1]  (Tr. 99.)  He alleged disability due to straightening of lumbar

lordosis, L3-4 broad-based disc herniation, L4-5 broad-based disc herniation, carpal tunnel,

sciatic nerve, low back pain radiating to both legs, and C7 damage.  (Tr. 94, 101.)  His

---

[1] The ALJ decision indicates that Plaintiff also filed an application for Supplemental Security Income ("SSI") on March 28, 2023 (Tr. 20), but the Transcript filed by the Commissioner does not include a record of this, nor does Plaintiff mention it in his brief.  (*See* ECF Doc. 9, p. 2.)

application was denied at the initial level (Tr. 99) and upon reconsideration (Tr. 100).  He then requested a hearing.  (Tr. 122-23.)

On August 14, 2023 and March 20, 2024, hearings were held before an Administrative Law Judge ("ALJ").  (Tr. 59-93.)  The ALJ issued an unfavorable decision on May 8, 2024, finding Mr. Baez-Cruz had not been under a disability from August 5, 2020, through the date of the decision.  (Tr. 14-48.)  Mr. Baez-Cruz requested review of the decision by the Appeals Council, and his request for review was denied on February 11, 2025, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5.)

Plaintiff filed the instant Complaint on June 5, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 9, 12, 13).  Plaintiff raises the following assignments of error:

(1)   The ALJ erred when she failed to properly apply the criteria of SSR 96-8p and consider all of Plaintiff's impairments and related limitations when forming the Residual Functional Capacity ("RFC");'

(2)   The ALJ erred at Step Three of the Sequential Evaluation when she failed to properly evaluate Plaintiff's headaches and find that Plaintiff equaled Listing 11.02B;

(3)   The ALJ erred when she failed to support and/or address consistency with her conclusions regarding the opinion of the treating source; and

(4)   The ALJ's finding that Plaintiff did not require the use of a cane or walker was not supported by substantial evidence and was contrary to SSR 96-9p.

(ECF Doc. 9, p. 1.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Baez-Cruz was born on March 25, 1982 and was 38 years old on the alleged disability onset date, making him a younger individual under Social Security regulations on the alleged onset date.  (Tr. 94.)  He had at least a high school education.  (Tr. 359.)  Mr. Baez-Cruz has not worked since August 5, 2020, the alleged onset date.  (Tr. 94.)

2

B.      **Medical Evidence**

1.      **Relevant Treatment History**[2]

On August 10, 2020, Mr. Baez-Cruz attended a consult with Robert Levinthal, M.D., DABNS, FACS, PLLC.[3]  (Tr. 462-65.)  He reported being unable to work for the past month due to frequent back and buttock pain with numbness and spasm.  (Tr. 462.)  He reported no headache, numbness, gait disturbance, joint pain, or muscle weakness.  (Tr. 463.)  Dr. Levinthal reviewed an MRI from August 7, 2020 and found it showed significant lumbar straightening with herniation and lipomatosis causing significant stenosis at L3/4 and to a lesser extent at L4/5. (Tr. 462; *see* Tr. 468-69.)  On examination, Mr. Baez-Cruz displayed a limp on the right side but was fully weight bearing with no assistive device.  (Tr. 464.)  He had severely reduced range of motion in the lumbar spine, but otherwise normal range of motion throughout the spine and extremities.  (*Id.*)  He had numbness and tingling of the left median nerve distribution and pain radiating down the right thigh and buttock, worse with extension, but his nerves were otherwise grossly intact and he displayed normal motor skills, balance, gait, and coordination.  (*Id.*)  Dr. Levinthal assessed chronic right sided low back pain with right sided sciatica, epidural lipomatosis, herniated intervertebral disc of lumbar spine, lumbar stenosis with neurogenic claudication, overweight, lumbar paraspinal muscle spasm, and left carpal tunnel syndrome.  (Tr. 464-465.)  He ordered an x-ray of the lumbar spine and referred Mr. Baez-Cruz to physical therapy.  (Tr. 465.)  An August 14, 2020 x-ray of the lumbar spine showed no acute fracture or

---

[2] The summary of the medical evidence is not exhaustive and is generally limited to evidence cited by the parties that is from the alleged disability period and relevant to the legal and factual issues before the Court.

[3] In his brief, Plaintiff refers to this as a "consultative examination."  (ECF Doc. 9, p. 2.)  However, Dr. Levinthal did not provide any opinion of Plaintiff's physical functioning (Tr. 457), and nothing in the record suggests that his examination of Mr. Baez-Cruz was arranged and paid for by the SSA pursuant to 20 C.F.R. § 1519.

subluxation, disc osteophyte greatest at L3-4, and facet hypertrophy greatest at L5-S1.  (Tr. 467.)

Mr. Baez-Cruz attended physical therapy on August 24, 2020.  (Tr. 473-77.)

On August 15, 2022, Mr. Baez-Cruz presented to his primary care physician, Jose

Mendoza, M.D., at Mercy Medical Partners to follow-up on chronic back pain.  (Tr. 538-40.)  He

reported aching pain of 6/10 in the lumbar spine and gluteal muscles with leg pain and numbness

and aching neck pain of 3/10 with bilateral arm pain.  (Tr. 538.)  A physical examination showed

normal range of motion, no cranial nerve deficit, normal heart rate and rhythm, and normal

mood.  (Tr. 540.)  Dr. Mendoza diagnosed acute left and right knee pain, low back pain radiating

to both legs, and bilateral leg pain.  (Tr. 540.)

Mr. Baez-Cruz attended a pain management appointment with Mohan Kareti, M.D., at

Mercy Health Sheffield Pain Management on September 13, 2022.  (Tr. 490-93 (dup. at 518-

20).)  He reported cramping, burning, and 7/10 right lower back pain with radiation down to the

right foot.  (Tr. 490.)  He endorsed weakness for the past month but no numbness.  (*Id.*)  A recent

EMG study indicated changes of bilateral L5 radiculopathy and a recent lumbar x-ray showed

chronic deformity of L4 with concern for acute fracture.  (*Id.*)  A physical examination showed

normal range of motion, supple neck, good gait, able to walk on toes and heels, mild joint

tenderness on both sides, and pain on right straight leg raise.  (Tr. 492.)  It also showed no focal

deficit, full orientation, and normal mood, behavior, thought content, and judgment.  (*Id.*)

In September 2022, Mr. Baez-Cruz started physical therapy for cervicalgia and pain in

both legs.  (Tr. 512-516, 521-23 (dup. at 684-87, 693-703)).  At an initial evaluation on

September 7, 2022 with Sara Formoso, PT, DPT, Mr. Baez-Cruz displayed decreased and painful

range of motion in the lumbar spine, mildly decreased strength in the hips right lower extremity,

and decreased strength and flexion in the trunk.  (Tr. 522-23.)  PT Formoso set a schedule of

therapy twice a week for five to six weeks.  (Tr. 523.)  Mr. Baez-Cruz returned to physical therapy on September 15, and continued to show decreased strength, endurance, and range of motion.  (Tr. 515-16.)  He walked with an antalgic gait and decreased weight bearing bilaterally and reported significant pain that limited activity during the session.  (*Id.*)  He was a no-show for appointments on September 19, 23, and 26.  (Tr. 512-14.)

On December 13, 2022, an MRI of the cervical spine showed straightening of the cervical spine and moderate central canal stenosis at C4/5 with moderate to severe right and severe left neural foraminal stenosis.  (Tr. 1505-1506.)

On December 19, 2022, Mr. Baez-Cruz presented to Loai F. Marouf, D.O., for a cardiology evaluation at Dr. Mendoza's referral.  (Tr. 2948-50.)  He reported that for the previous two months he had experienced a sharp/aching/pulsating sensation that radiated to his low back with associated shortness of breath, nausea, vomiting, and diaphoresis.  (Tr. 2949.) These symptoms occurred mainly with physical activity and lasted 30 minutes but resolved with rest.  (*Id.*)  He also reported fatiguing easily, bilateral arm and leg paresthesia due to sciatica, and chronic back pain with disc herniation and reproducible chest wall pain at the left fourth intercostal space.  (*Id.*)  On examination, he was alert and oriented, his cranial nerves were grossly intact, he had regular heart rate/rhythm, and he did not exhibit any focal, sensory, or motor deficits.  (Tr. 2950.)  Dr. Marouf assessed dyspnea on exertion, precordial pain with typical and atypical features, and lumbar radiculopathy.  (*Id.*)

Mr. Baez-Cruz returned to see Dr. Mohan for a pain management follow-up on January 30, 2023.  (Tr. 774-76.)  A physical examination showed normal range of motion, good gait, ability to walk on toes and heels, mild joint tenderness bilaterally, and pain on right straight leg raise.  (Tr. 776.)  Mr. Baez-Cruz was alert and oriented, had no focal deficits, and displayed

normal mood, behavior, thought content, and judgment.  (*Id.*)  Dr. Mohan ordered a foraminal epidural steroid injection at right L3-4 with plans to discuss surgery if it provided no relief.  (*Id.*)

On February 9, 2023, Mr. Baez-Cruz underwent left heart catheterization via the right radial artery approach, selective right and left coronary angiography, and left ventriculogram, and he was found to have moderate nonobstructive coronary artery disease.  (Tr. 794-96.)

On March 6, 2023, Mr. Baez-Cruz underwent a right bilateral L3/4 micro decompression with Gale Hazen, M.D., at Mercy Health Sheffield Neurosurgery.  (Tr. 736.)  At a post-operative visit on April 6, 2023, he said he did not feel any better after surgery and in some ways felt worse.  (Tr. 748.)  He still experienced back and lower right extremity pain when he was up for about 15 minutes, with new pain on the left side down to the knee.  (*Id.*)  He had a tender lump on his back.  (*Id.*)  On examination, he was walking better than before surgery, with an improved limp on the right side, and he could stand up independently, while pre-surgery he had to push himself up on the arms of chairs.  (*Id.*)  His wound was healing, and he had good range of motion in the knees and hips.  (*Id.*)  Dr. Hazen prescribed increased gabapentin and a walker.  (Tr. 749.)

On May 22, 2023, Mr. Baez-Cruz presented to Dhruv R. Patel, M.D., at Mercy Health Neurology as a new patient.  (Tr. 718-24.)  He reported that he had always had headaches, but they had recently increased to more than 15 headache days a month.  (Tr. 718.)  All pain was on the right side and accompanied by vision loss/blurriness.  (*Id.*)  He denied dizziness, tremors, seizures, syncope, lightheadedness, numbness, or weakness.  (Tr. 721.)  On examination, he displayed normal range of motion, normal gait, no sensory deficit, normal coordination, and normal mood.  (Tr. 721-22.)  Dr. Patel reviewed a CT scan from December 2022, finding it showed a small area of encephalomalacia in the right frontal lobe.  (Tr. 718.)  He also noted that a recent MRI showed moderate canal stenosis of the cervical spine, which could contribute to

6

headaches.  (Tr. 723.)  Dr. Patel assessed chronic migraine without aura without status migrainosus, not intractable, and migraine-cluster headache syndrome.  (*Id.*)  He prescribed topiramate and sumatriptan for migraines.  (*Id.*)

On June 22, 2023, Mr. Baez-Cruz attended a neurosurgery appointment with Dr. Hazen for review of a May 31, 2023 lumber MRI and x-ray.  (Tr. 732-39.)  The MRI showed: mild central canal stenosis at L3-4, significantly improved since October 3, 2022, following hemilaminectomy; moderate central canal stenosis at L4-5; and moderate neural foraminal stenoses at L3-4 and L4-5.  (Tr. 732-33.)  The x-ray showed disc space narrowing in the mid to lower lumbar spine, particularly at L3-4.  (Tr. 733.)  A physical examination showed normal range of motion except at the right hip, normal mood, no focal deficit, a well-healed lumbar scar, limping to the right side, "[s]trength and sensation on individual muscle strength testing," and increased pain in the back with hip flexion.  (Tr. 739.)  Dr. Hazen noted that the imaging showed severe degenerative disc disease at L3-4 and discussed the potential for surgery if nonsurgical treatment failed.  (*Id.*)  She recommended pain management and a recheck in two months.  (*Id.*)

Mr. Baez-Cruz followed up with Dr. Hazen on August 22, 2023.  (Tr. 1345-53.)  He continued to report back pain but denied neck pain and headaches.  (Tr. 1348).  His physical examination remained unchanged from the previous visit.  (Tr. 1349).  Dr. Hazen noted that Mr. Baez-Cruz had completed a course of physical therapy with no improvement and that injections helped maybe for an hour but not overall.  (Tr. 1353.)  She discussed surgical options with him in detail, and he agreed to proceed with back surgery.  (*Id.*)

A September 7, 2023 CT scan of Mr. Baez-Cruz's head revealed no acute intracranial abnormality.  (Tr. 1459.)

On September 27, 2023, Mr. Baez-Cruz underwent "bilateral L3/4 laminectomies, microdissection decompression discectomy interbody cage posterior lateral infuse pedicle screw fusion," performed by Dr. Hazen.  (Tr. 1024; *see also* Tr. 1028-30.)   He was discharged with a walker and instructions that his spouse help him with bathing.  (Tr. 1026-27.)

At a post-operative visit with pain management on October 10, 2023 (Tr. 1327-30), Mr. Baez-Cruz reported that he initially felt his leg pain had resolved after surgery, but he was having burning down the right leg and a cramp in the right heel as of the appointment.  (Tr. 1329.)  He could walk independently and get out of his chair unassisted.  (*Id.*)  He rated his pain as 8/10 but noted he had been "very active" that day and normally his pain levels were "much lower."  (*Id.*)  He denied a refill of norcocaine and was referred to physical therapy.  (Tr. 1330.)

On October 24, 2023, Mr. Baez-Cruz attended a post-operative follow-up with Dr. Hazen.  (Tr. 1944-45.)  Review of post-surgery x-rays showed post-surgical fixation at L3-4 with normal alignment.  (Tr. 1944.)  Mr. Baez-Cruz had improved from his preoperative status in that he could walk straight heel-to-toe.  (*Id.*)  He still felt residual pain that interfered with driving and reported that he still depended on the wheeled walker he brought to the appointment.  (*Id.*)  He was nonetheless starting to slowly improve his activities.  (*Id.*)

On October 27, 2023, Mr. Baez-Cruz attended an initial physical therapy evaluation with Meghan Stephens, PT.  (Tr. 1932-37.)  He reported constant back pain post-surgery, numbness in toes on the right, burning in the right leg, and cramps in bilateral heels.  (Tr. 1933.)  The pain was worse at night.  (*Id.*)  He could stand up straight since having the surgery but could only lay on his back with three pillows supporting the upper half.  (*Id.*)  On examination, he did not stumble or give way while walking, but he had an antalgic gait and used a rollator for ambulation.  (Tr. 1934-35.)  His overall sensation status was impaired, and his lower extremity

8

strength and range of motion were limited.  (Tr. 1935.)  PT Stephens recommended physical therapy two to three times a week for four to six weeks.  (Tr. 1936.)

Mr. Baez-Cruz attended a physical therapy appointment on November 13, 2023 with Olivia Rowan, PTA.  (Tr. 1858-1860.)  He reported high pain levels with better and worse days.  (Tr. 1858.)  He had missed the previous appointment due to pain levels and had recently fallen while getting out of bed because his legs "gave out on him." (*Id.*)  PT Rowan assessed decreased functional mobility, strength, endurance, sensation, and range of motion.  (Tr. 1859.)

That same date, Mr. Baez-Cruz attended a cardiology follow-up with Dr. Marouf.  (Tr. 1440-42 (dup. at 1867- 69).)  He reported ongoing chest pain that radiated to his back, occurring mainly with physical activities.  (Tr. 1440).  Two weeks prior, he said he experienced the pain for two hours while at rest but did not go to the ER.  (*Id.*)  He did not experience palpitations or near syncope.  (*Id.*)  A recent stress test was negative for ischemia, and a recent echocardiogram showed preserved LV function.  (Tr. 1440-41.)  On examination, Mr. Baez-Cruz was positive for dyspnea with mild to moderate activity, positive for lower extremity edema and bilateral arm and leg paresthesia due to sciatica, positive for back pain, and negative for anxiety.  (Tr. 1441-42.)  He was alert and oriented, his heart rate/rhythm were regular, and he showed no focal sensory and/or motor deficits.  (Tr. 1442.)  Dr. Marouf opined that Mr. Baez-Cruz appeared to be stable from a cardiac standpoint, he did not need further cardiac testing, and he should continue with medical therapy and risk factor modification.  (*Id.*)

On January 24, 2024, Mr. Baez-Cruz attended a neurology appointment with Dr. Patel.  (Tr. 2243-48 (dup. at 2652-58).)  He continued to report headaches with migraines, stating he got a migraine three times a day that lasted about three days, during which he had to avoid light and loud noises.  (Tr. 2243.)  He denied dizziness, tremors, syncope, weakness, numbness, and

9

lightheadedness.  (Tr. 2245.)  On physical examination, he displayed normal range of motion, normal coordination, full orientation, no cranial nerve deficit, no abnormal muscle tone, normal reflexes, and normal mood.  (*Id.*)  Dr. Patel diagnosed obstructive sleep apnea, chronic migraine without aura without status migrainousus, not intractable, cervicogenic headache, cervical spinal stenosis, and lumbar disc herniation.  (Tr. 2247.)  He discontinued topiramate and started Depakote to treat migraines.  (*Id.*)

On February 27, 2024, Mr. Baez-Cruz attended a new patient pulmonary/sleep appointment with Rami Abboud, M.D., at Mercy Health Physicians Specialty Care, LLC.  (Tr. 2628-31.)  He reported being tired and sleepy during the day and waking up gasping for air with a morning headache sometimes.  (*Id.*)  On examination, he was alert and oriented and in no acute distress.  (Tr. 2631).  He had no focal deficits or weakness, and his mood was normal.  (*Id.*)

Mr. Baez-Cruz presented to Dr. Mendoza for a primary care appointment on March 6, 2024.  (Tr. 2623.)  He reported arthralgias, myalgias, back pain, and neck pain, but he did not report tremors, syncope, or headaches.  (Tr. 2625-26).  On examination, he displayed normal range of motion, he was alert and oriented, and his mood and affect were normal.  (Tr. 2626.)

Starting August 1, 2023, Mr. Baez-Cruz sought mental health treatment at Family Solutions due to depression, anxiety, and difficulty with emotional regulation, specifically anger management.  (Tr. 1400-1426; 2585-2615.)  On August 29, 2023, his mental status examination noted his memory, insight, and judgment were good, his behavior cooperative, his speech and mood normal, his affect appropriate, his thought process coherent, and his intellect average.  (Tr. 1404, 1405.)  Licensed Social Worker Stefanie Leos diagnosed him with generalized anxiety disorder and depression due to chronic pain.  (Tr. 1400.)  Mr. Baez-Cruz met with Qualified Behavioral Health Specialist Melivette Mori Santos at least weekly through September and

October 2023 (Tr. 1413-20) and reported anxiety and depression surrounding his September 2023 surgery and recovery (Tr. 1415-16, 1418).

On November 30, 2023, Mr. Baez-Cruz underwent an initial psychiatry evaluation with Nurse Practitioner Daray Cochran-Ukaegbu at Family Solutions.  (Tr. 2603-05.)  He reported increased stress, chronic pain, insomnia, depression, anxiety, anger, and irritability.  (Tr. 2603.)  He was taking Cymbalta for depression.  (Tr. 2604.)  A mental status examination showed no psychomotor agitation or retardation, euthymic mood with congruent affect, coherent thought content, good insight and judgment, intact memory, clear speech with normal rate and tone, and difficulty with concentration and focus.  (Tr. 2604).  NP Cochran-Ukaegbu diagnosed major depressive disorder and other specific mental disorders due to known physiological condition.  (*Id.*)  She increased Mr. Baez-Cruz's dose of Cymbalta.  (Tr. 2605.)

On December 28, 2023, Mr. Baez-Cruz reported continued feelings of depression and a severe headache.  (Tr. 2607.)  NP Cochran-Ukaegbu increased his Cymbalta dose again and recommended psychotherapy.  (Tr. 2609.)  On January 25, 2024, Mr. Baez-Cruz reported continued depression and a panic attack with hearing voices.  (Tr. 2610.)  At the next appointment, on February 22, 2024, he reported an improvement in depression and denied panic attacks.  (Tr. 2613.)  His mental status examination findings remained unchanged at these three appointments, with the exception of a "history of auditory hallucinations of hearing voices," which he reported at the January and February appointments.  (Tr. 2608, 2611, 2614.)

### 2.    Opinion Evidence

#### i.    Treating Source

On November 15, 2023, Plaintiff's primary care provider Dr. Mendoza completed a medical source statement.  (Tr. 1733-36.)  Dr. Mendoza opined that Mr. Baez-Cruz could sit for

30 minutes at one time, stand for 45 minutes at one time, and sit for less than two hours total in an 8-hour workday.  (Tr. 1734.)  He checked a box "yes," indicating Mr. Baez-Cruz must use a hand-held assistive device due to pain and weakness.  (Tr. 1735.)  But he also indicated that Mr. Baez-Cruz did not need a cane or other hand-held assistive device for walking, standing or both, and did not need a hand-held assistive device all of the time.  (*Id.*)  Finally, he opined that Mr. Baez-Cruz was likely to be absent from work more than four days per month.  (Tr. 1736.)

### ii.    State Agency Medical Consultants

On May 3, 2022, state agency medical consultant Laurence Ligon, M.D., found the evidence submitted "insufficient to complete the needed medical assessment."  (Tr. 96.)  He did not make a physical RFC determination.

On December 6, 2022, on reconsideration and after Plaintiff submitted additional evidence, state agency medical consultant Mehr Siddiqui, M.D., made a physical RFC determination.  (Tr. 104-05.)  Dr. Siddiqui opined that Mr. Baez-Cruz had the RFC to: occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk about 6 hours in an 8-hour workday and sit more than 6 hours in an 8-hour workday; never climb ladders, ropes, or scaffolds; occasionally stoop and crawl;  frequently balance, kneel, crouch, and climb ramps and stairs; frequently reach overhead bilaterally and handle/finger with the right upper extremity; and avoid all exposure to hazards such as unprotected heights and heavy machinery.  (*Id.*)

### C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the hearings on August 14, 2023 and March 20, 2024, Mr. Baez-Cruz testified in response to questions from the ALJ and his attorney.  (Tr. 67-75, 87-91.)  A Spanish interpreter was present (Tr. 61, 82), and a Vocational Expert ("VE") also testified (Tr. 74-78,91-92).

12

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination could not perform Mr. Baez-Cruz's prior work but could perform representative positions in the national economy, including routing clerk, marker, and collator operator.  (Tr. 75-76.)  The VE also testified that it would preclude competitive employment if the person would need a walker or be absent more than two days a month.  (Tr. 76-77.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

13

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

### IV.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028,

14

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**A.      First Assignment of Error: The ALJ Complied with SSR 96-8p and Adequately Considered Plaintiff's Mental Impairments When Formulating the RFC**

In his first assignment of error, Plaintiff argues that the ALJ failed to properly apply Social Security Ruling ("SSR") 96-8p and consider the limitations and restrictions caused by his

15

mental impairments when determining the RFC.  (ECF Doc. 9, pp. 1, 8-11.)  The Commissioner

argues in response that the ALJ properly considered Plaintiff's mental impairments and made

findings that were supported by substantial evidence.  (ECF Doc. 12, pp. 7-9.)

SSR 96-8p provides that "[t]he RFC assessment must be based on *all* of the relevant

evidence in the case record," explaining further:

> In assessing [the] RFC, the adjudicator must consider limitations and restrictions
> imposed by all of an individual's impairments, even those that are not "severe."
> While a "not severe" impairment(s) standing alone may not significantly limit an
> individual's ability to do basic work activities, it may—when considered with
> limitations or restrictions due to other impairments—be critical to the outcome of
> a claim.

SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474,

34477 (July 2, 1996) (emphasis in original).  The Sixth Circuit also recognizes that an ALJ must

consider "the combined effect of all of the claimant's impairments without regard to whether any

such impairment, if considered separately, would be of sufficient severity to render the claimant

disabled."  *Walker v. Sec'y of Health & Hum. Servs.*, 980 F.2d 1066, 1071 (6th Cir. 1992).

In support of his assertion that the ALJ "clearly failed to consider any of [his mental]

impairments and relating limitations when forming her RFC," Mr. Baez-Cruz provides only a

short summary of findings from his limited mental health treatment records and an observation

that the ALJ "failed to include any limitations related to Plaintiff's depression and/or anxiety" in

the RFC.  (ECF Doc. 9, pp. 9-11.)  He does not acknowledge the ALJ's lengthy, detailed analysis

of the records relevant to his mental health symptoms and treatment.  (*See* Tr. 23-29, 40-41.)

A review of the ALJ's written decision reveals that she carefully considered Mr. Baez-

Cruz's complaints, clinical findings, and treatment for his mental impairments.  At Step Two, she

gave a detailed summary of his subjective complaints and mental status findings, as reflected in

both his limited mental health treatment records and his physical treatment records (Tr. 24),

16

followed by a detailed breakdown of his subjective complaints (or sometimes lack thereof), activities of daily living, and clinical findings relevant to each of the four categories of mental functioning (Tr. 24-29).  The ALJ found "mild" limitations, which she characterized as "no more than a slight degree of limitation," in each category (*id.*), and found Mr. Baez-Cruz's medically determinable impairments of depression and generalized anxiety disorder did not cause more than minimal limitations in functioning and therefore were not severe impairments (Tr. 23).

More specifically, the ALJ noted that Mr. Baez-Cruz did not begin mental health treatment until August 2023, and that his treatment was limited to medication management.  (Tr. 24.)  She noted that his mental health records described him as appropriately dressed, with good eye contact, full orientation, euthymic mood/affect, coherent thought content, good judgment and insight, intact memory, clear speech, and difficulty with concentration and focus.  (*Id.* (citing Tr. 2585, 2590-91, 2606, 2608, 2611, 2614).)  She also noted that mental status findings from his physical health treatment records showed normal mood, affect, behavior, thought content, and judgment.  (*Id.* (citing Tr. 493, 540, 492, 720-21, 764-65, 781-82, 2245, 2626, 2655).)  She also considered Mr. Baez-Cruz's statements regarding his symptoms and activities of daily living, noting that he did not report difficulties with remembering, understanding, following instructions, or completing tasks, and was able to independently manage his medications and finances, could shop for food via phone, finished what he started, and spent time with family and friends.  (Tr. 24-29 (citing Tr. 393-400 and hearing testimony).)

At Step Four, the ALJ devoted several paragraphs to explaining why Mr. Baez-Cruz's allegations of disabling mental limitations were not entirely consistent with the record.  (Tr. 40-41.)  She acknowledged his allegations of depression, anxiety, and crying episodes (Tr. 40), but compared his complaints to his reported daily activities, including managing his medications,

17

shopping via phone for food, managing money, spending time with others via video chat, finishing what he starts, and going where he needs to without reminders (Tr. 40-41 (citing Tr. 393-400)).  The ALJ also detailed his largely normal mental status findings, concluding that they "do not support more than a slight degree of limitation in any areas of mental functioning" (*id.* (citing Tr. 492, 540, 720-21, 764, 781-82, 2245, 2585, 2590, 2608, 2611, 2614, 2626, 2655)) and noted the absence of any "medical source opinions suggesting any degree of mental functional limitations, which is not entirely consistent with the presence of severe mental impairments or related mental functional limitations" (Tr. 41).  Based on those considerations, the ALJ found that Mr. Baez-Cruz's allegations regarding mental limitations were "not entirely consistent with [his] reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions," and that his mental impairments were "not severe."  (*Id.*)  She therefore adopted an RFC without any mental limitations (Tr. 32) and concluded that the RFC was "supported by and consistent with the evidence of record . . ." and "reasonably accommodate[d] the physical and mental limitations the claimant experiences" (Tr. 42).

Although Plaintiff summarizes evidence that he believes supports his arguments, he does not specifically identify material evidence that the ALJ either misrepresented or failed to address. (*See* ECF Doc. 9, pp. 9-10.)  The ALJ was not required to discuss all of the evidence, but only to consider the evidence as a whole and reach a reasoned conclusion.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  Having reviewed the underlying evidence and the ALJ's written decision, the undersigned concludes that the ALJ's detailed analysis was sufficient to support a finding that she both considered the evidence as a whole and reached a reasoned conclusion.  Mr. Baez-Cruz certainly has not shown that the ALJ's findings

18

lacked the support of substantial evidence.  *See Blakley*, 581 F.3d at 406 ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

For the reasons stated above, the undersigned finds that Mr. Baez-Cruz has not shown that the ALJ failed to comply with SSR 96-8p, or that the ALJ's RFC findings at Step Two or Four lacked the support of substantial evidence.  Accordingly, the undersigned finds that the first assignment of error is without merit.

**B.      Second Assignment of Error: The ALJ Properly Evaluated Plaintiff's Headaches Under Listing 11.02B**

In Plaintiff's second assignment of error, he argues that the ALJ erred at Step Three of the sequential evaluation by finding that Plaintiff's headache impairment did not medically equal Listing 11.02B.[4]  (ECF Doc. 9, pp. 12-14; ECF Doc. 13, pp. 1-3.)  The Commissioner responds that the ALJ properly evaluated Plaintiff's headache impairment, and her Step Three findings are supported by substantial evidence.  (ECF Doc. 12, pp. 9-11.)

**1.      Legal Framework for Step Three Evaluation of Headaches**

At Step Three of the disability evaluation, a claimant is disabled if his impairment meets or equals one of the listings in the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'"  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(c)(3)).  The claimant bears the burden to prove that his condition meets or

---

[4] Plaintiff also asserts in passing that the ALJ erred by failing to consider the effects of his migraines on his ability to engage in substantial gainful activity on a full-time and sustained basis.  (ECF Doc. 9, p. 14.)  The undersigned considers this argument inadequately developed and therefore waived.  *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citations omitted) (alterations in original).

equals a listing.  *See* 20 C.F.R. § 404.1520(d); *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x

533, 539 (6th Cir. 2014) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)).  To do so,

he "must present specific medical findings that satisfy the various tests listed in the description

of the applicable impairment or present medical evidence which describes how the impairment

has such equivalency."  *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or

'to discuss listings that the applicant clearly does not meet.'"  *Smith-Johnson v. Comm'r of Soc.

Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F.

App'x 639, 641 (6th Cir. 2013)).  An "ALJ should discuss the relevant listing, however, where

the record raises 'a substantial question as to whether [the claimant] could qualify as disabled'

under a listing."  *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918,

925 (6th Cir. 1990)) (alteration in original).

While there is no listing for headaches, SSR 19-4p provides guidance on how "primary

headache disorders" such as migraines are established and evaluated, SSR 19-4p, 84 Fed. Reg.

44667, 44667-71 (Aug 26, 2019), explaining: "While uncommon, a person with a primary

headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02

(paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically

equals the listing," *Id.* at 44671.  While a claimant cannot "meet" a listing for headache—as no

such listing exists—her headaches could "medically equal" Listing 11.02 for epilepsy.  *Id.*  SSR

19-4p further addresses the application of Paragraph B of Listing 11.02 to headaches as follows:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once
> a week for at least 3 consecutive months despite adherence to prescribed treatment.
> To evaluate whether a primary headache disorder is equal in severity and duration
> to the criteria in 11.02B, we consider: A detailed description from an [acceptable
> medical source] of a typical headache event, including all associated phenomena
> (for example, premonitory symptoms, aura, duration, intensity, and accompanying

symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.*

To meet his burden to show that an impairment medically equals a listing, Mr. Baez-Cruz must prove that "the findings related to [the] impairment(s) [were] at least of equal medical significance to those of a listed impairment." 20 C.F.R. § 404.1526(b)(2). Further, before an ALJ can find he medically equals a listing, the record "must" contain one of the following:

1. A prior administrative medical finding from [a state agency medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2. [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or

3. A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

SSR 17-2p, 82 Fed. Reg. 15263, 15265 (March 27, 2017). Thus, an ALJ may only find medical equivalence at the hearing level if the record contains supportive medical opinion findings from either a state agency consultant or a medical expert. *Id.* And if the ALJ "believes the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment," SSR 17-2p provides that the ALJ need not obtain medical expert evidence, and in fact need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.*

21

**2.      The ALJ Appropriately Evaluated Plaintiff's Migraine Headaches**

Mr. Baez-Cruz argues that that the ALJ "erred when she failed to find that the treatment notes as corroborated by Plaintiff's testimony satisfied all the elements of the relevant Ruling" because "Plaintiff's continued headaches equaled the criteria of Listing 11.02B."  (ECF Doc. 9, p. 14; *see also,* ECF Doc. 13, pp. 1-3.)  Specifically, he asserts that the ALJ "failed to address the frequency of the migraines in conjunction with Listing 11.02B" and that his headaches "satisfied the frequency criteria."  (ECF Doc. 9, p. 13.)

The ALJ identified migraine headaches as a severe impairment at Step Two (Tr. 23) but found the impairments did not medically equal Listing 11.02 at Step Three, explaining:

> The record does not support a frequency of migraine/headache activity and extent of symptoms, by analogy, that equates to that of the frequency and severity of seizure activity required for any of the subparts of this Listing. Moreover, the claimant does not have a marked limitation in physical functioning, as demonstrated by the above-referenced physical examination findings. Also, the record does not support that the claimant has experienced any significant or marked degree of limitation in these areas of functioning discussed in subsections 11.00G3b(i) to (iv) [explaining the four broad areas of mental functioning]. The claimant has no admissions related to headaches. The record also does not suggest more than mild deficits in any of the areas discuss in subsections 11.00G3b(i) to (iv). Accordingly, the evidence of record does not satisfy the necessary criteria of Listing 11.02B or D. Thus, by analogy the claimant's headache/migraine disorders do not satisfy the criteria of Listing 11.02.

(Tr. 31-32.)

As an initial matter, the undersigned notes that the record is devoid of any medical opinion findings from a state agency consultant or a medical expert indicating that Plaintiff's headache impairment medically equaled Listing 11.02B.  Thus, the ALJ was precluded from making such a finding under SSR 17-2p.  *See* SSR 17-2p, 82 Fed. Reg. at 15265.

Plaintiff asserts that a supportive medical opinion finding is not required because is not mentioned in SSR 19-4p.  (ECF Doc. 13, pp. 1-2.)  But the language in SSR 19-4p simply outlines the mechanism through which a "medically equals" finding may be reached for a

22

primary headache disorder.  There is nothing in SSR 19-4p's language that exempts such medical equivalence findings from the requirements of SSR 17-2p, which applies to all medical equivalence determinations.  *See* SSR 17-2p, 82 Fed. Reg. 15263.  SSR 17-2p clearly states that the evidentiary record "must" contain a finding of medical equivalence by a state agency consultant at the initial or reconsideration level or a medical expert at the hearing level before an ALJ may find that a claimant medically equals a listing.  *Id.* at 15265.  Mr. Baez-Cruz's argument that a "medical source opin[on]" is not required is thus without merit.

Mr. Baez-Cruz's additional arguments that the ALJ failed to discuss the criteria of SSR 19-4p and/or the frequency of the migraines under Listing 11.02B are likewise unavailing.  (*See* ECF Doc. 9, pp. 12-14; ECF Doc. 13, pp. 2-3.)  First, since the ALJ found that the evidence did not support a medical equivalence finding, he was not required to "articulate specific evidence supporting his . . . finding" that the impairments did not medically equal Listing 11.02.[5]  *See* SSR 17-2p, 82 Fed. Reg. at 15265.  Second, it is evident that Mr. Baez-Cruz has not met his burden to "point to specific evidence that demonstrates he reasonably could . . . equal *every requirement* of the listing."  *Smith-Johnson*, 579 F. App'x at 432 (emphasis added).  While Mr. Baez-Cruz cites to records indicating he complained of headaches to his providers and testified to very frequent headaches (ECF Doc. 9, pp. 12-13), he does not identify records showing, e.g., a "detailed description from an [acceptable medical source] of a typical headache event" or medical records establishing that his headaches met frequency requirements "despite adherence to prescribed treatment."  SSR 19-4p, 84 Fed. Reg. at 44671.

---

[5] SSR 17-2p provides that an ALJ "may ask for and consider evidence from medical experts." 82 Fed. Reg. at 15264.  But an ALJ is not required to call a medical expert, and Mr. Baez-Cruz has not argued that the ALJ failed in his duty to develop the record.  Accordingly, any such argument is waived and will not be considered.

Finally, the ALJ "made sufficient factual findings elsewhere in his decision to support his conclusion[s] at step three." *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).  At Step Four, he provided a detailed discussion of Mr. Baez-Cruz's migraine headaches, where he recognized that reports of headaches "vary widely in the record. At times [Mr. Baez-Cruz] reported headaches of up to 3 a day and other times he denied them altogether."  (Tr. 39 (comparing records at which Plaintiff cited a headache (Tr. 579, 718, 762, 764, 807, 886, 1044, 2118, 2243, 2607) with those at which he did not (Tr. 449, 463, 543, 547, 738, 1203, 1348, 2624).)  Plaintiff's inconsistent reports of headaches support the ALJ's finding that Plaintiff's headache impairment did not meet the frequency requirements of SSR 19-4p.  (*See* Tr. 31.)

For all the reasons set forth above, the undersigned concludes that the ALJ appropriately addressed medical equivalence as to migraine headaches under Listing 11.02, in accordance with regulatory requirements, and that Mr. Baez-Cruz has not met his burden to demonstrate otherwise.  Accordingly, the undersigned finds the second assignment of error lacks merit

**C.  Third Assignment of Error: The ALJ Properly Evaluated the Treating Source Opinion of Jose Mendoza, M.D.**

In his third assignment of error, Plaintiff argues that the ALJ failed to properly consider the persuasiveness of the medical opinion of his treating physician Dr. Mendoza.[6]  (ECF Doc. 9,

---

[6] At the end of this argument, Mr. Baez-Cruz adds a conclusory assertion that the ALJ's reliance on the December 2022 opinion of state agency medical consultant Mehr Siddiqui, M.D., was "neither supported by nor consistent with the medical evidence presented after December 2022," which documented his "deteriorating condition, including additional severe impairments, as well as additional surgeries."  (ECF Doc. 9, p. 19.)  This argument was not included in the caption for the assignment of error—which related explicitly to "the opinions of treating sources" (*id.* at pp. 1, 15)—and was not adequately developed.  The undersigned accordingly finds the argument waived.  *See McPherson,* 125 F.3d at 995-96.  Further, the argument lacks merit.  The Sixth Circuit has clearly held that an ALJ may rely on state agency opinions that do not account for all relevant medical evidence if the ALJ takes the evidence into account.  *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (rejecting argument that an "ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition," finding it sufficient that the ALJ considered later medical records and "took into account any relevant changes in [the claimant]'s condition").  Here, the ALJ considered spine imagery (Tr. 34), cardiac testing and treatment (Tr. 35), back surgeries (Tr. 36), and other records post-dating Dr. Siddiqui's opinion (*see* Tr. 42-43).  Mr. Baez-Cruz certainly has not identified material records that the ALJ failed to consider.

24

pp. 15-19.)  The Commissioner responds that Plaintiff's arguments are inaccurate, and that the ALJ provided "a thorough recitation of evidence to support her conclusions" which "provided more than enough justification for her conclusions[.]"  (ECF Doc. 12, pp. 12-13.)

Under applicable regulations, an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 416.920c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024) (quoting 20 C.F.R. § 404.1520c(a)).  However, the ALJ must evaluate the "persuasiveness" of any medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 416.920c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability[7] and consistency.[8]  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2), 416.920c(c)(1)-(5).  The ALJ must therefore explain how they considered consistency and supportability but need not explain how they considered other factors.  20 C.F.R. § 416.920c(b)(2).

Here, the ALJ evaluated Dr. Mendoza's opinion as follows:

The claimant's physician, Jose Mendoza, M.D. (11/15/23), opined that the claimant can sit 30 minutes and stand 45 minutes at one time; sit a total of less than 2 hours per day; he requires a cane or other hand-held assistive device for pain and weakness; he does not need the device for walking, stand, or both; he has good and bad days; and he would be absent four or more days per month (19F/1-4). While there are treatment notes close to the time the opinion was generated, the portions noting limitations sitting of no more than less than 2 hours per day total and absenteeism are not consistent with the record. Also, the portion noting the need for an ambulatory aid is not entirely consistent with the record. . . . The claimant's reports and exam findings demonstrate intermitting issues with an antalgic gait, some straight leg raise testing on the right, some reduced reflexes at time, and some

---

[7] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion.  *See* 20 C.F.R. § 416.920c(c)(1).

[8] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.  *See* 20 C.F.R. § 416.920c(c)(2).

25

pain in the lumbar spine; however, the claimant's exam findings also demonstrate intact sensation, gait, strength, range of motion, reflexes, and coordination. This evidence is not entirely consistent with significant, disabling limitations in standing, walking, sitting, postural activities, as reported by the claimant. This evidence does not suggest that the claimant would be absent to any degree of incapable of sustaining at least light exertion, consistent with the abilities set forth in the above residual functional capacity finding.

The record does not support that an assistive device such as a walker or cane is medically necessary. . . . While the claimant has an antalgic gait with a limp, at times throughout the record, the evidence does not suggest that a cane or other ambulatory aid is medically necessary. The state agency medical consultant also did not indicate the need for any ambulatory aids. Thus, this portion of Dr. Mendoza's opinion is not consistent with the record.

(Tr. 44-45 (emphasis added).)  In the places marked by ellipses above, the ALJ included lengthy

summaries of relevant clinical findings from Plaintiff's treatment records, including clinical

findings from treatment visits with Dr. Mendoza on August 15, 2022, and March 6, 2024.  (*See*

*id.* (citing *inter alia* Tr. 450, 2626).)

Plaintiff argues that the ALJ erroneously "focused on the fact that she did not believe that

[Plaintiff] needed an ambulatory aid" and "otherwise . . . failed to make any findings regarding

the supportability and consistency of Dr. Mendoza's remaining limitations."  (ECF Doc. 9, p.

18.)  Neither assertion is supported by a review of the ALJ's decision.

First, the ALJ clearly did not limit her discussion to Dr. Mendoza's opinion regarding the

need for an ambulatory aid.  She also explicitly addressed Dr. Mendoza's opinions regarding

"limitations in standing, walking, sitting, postural activities" and absenteeism, citing extensively

to clinical findings in the record to support her conclusions.  (*See* Tr. 44-45.)

Second, as to the consistency of the opinion—the extent to which the opinion findings

were consistent with evidence from other medical and nonmedical sources—the ALJ explained

that Dr. Mendoza's restrictive limitations were "not entirely consistent" with medical records

from various providers that showed: inconsistent reports of headaches; inconsistent use of a

26

cane; some pain and tenderness in the back and lower extremities; and largely normal physical examinations, including normal range of motion, no motor deficits, normal breathing sounds and effort, normal heart rate and rhythm, normal gait, normal strength, and no neurological, focal, or motor deficits.  (Tr. 44-45.)  The ALJ thus appropriately addressed consistency.

Third, turning to the supportability of the opinion—the extent to which Dr. Mendoza's own objective findings and supporting explanations substantiate or support the findings in his opinion—the ALJ's discussion of clinical findings and treatment records supporting her findings specifically addressed Dr. Mendoza's own treatment records.  (*See* Tr. 44 (citing Tr. 540); Tr. 45 (citing Tr. 2626).)  At the cited appointments, Mr. Baez-Cruz reported back pain but no headaches, and displayed normal range of motion, normal breathing effort and sounds, and normal cardiovascular signs.  (Tr. 540, 2626.)  The records thus supported the ALJ's finding that various records showing back pain but "intact . . . range of motion" are "not entirely consistent with significant, disabling limitations in standing, walking, sitting, postural activities, as reported by the claimant."  (Tr. 45.)  The ALJ thus appropriately addressed supportability.

Finally, the undersigned rejects Plaintiff's conclusory allegation that the ALJ "failed to review the medical evidence which supported" Dr. Mendoza's opinion.  (ECF Doc. 9, p. 19.)  Plaintiff does not identify any evidence that the ALJ allegedly failed to consider.  And most of the medical records he does summarize as support for Dr. Mendoza's opinion were also summarized and considered by the ALJ.  (*See* ECF Doc. 9, pp. 16-18.)  To the extent the ALJ did not mention some of the records cited by Plaintiff, the ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley*, 397 F. App'x at 199 (citing *Kornecky*, 167 F. App'x at 507-08).  And even if substantial evidence supports Mr.

Baez-Cruz's position, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

For the reasons set forth above, the undersigned concludes that the ALJ provided an adequate explanation for her findings regarding the persuasiveness of Dr. Mendoza's opinion, including an appropriate discussion of both the consistency and supportability of that opinion, and made findings that were supported by substantial evidence.  Accordingly, the undersigned finds the third assignment of error to be without merit.

**D.      Fourth Assignment of Error: The ALJ's Decision Not to Require an Assistive Device in the RFC Was Supported by Substantial Evidence and Not Contrary to SSR 96-9p**

In his fourth assignment of error, Mr. Baez-Cruz argues that the ALJ erred when she found the record did not support the need for an assistive device and did not include the need for such a device in the RFC.  (ECF Doc. 9, pp. 20-22; ECF Doc. 13, pp. 3-4.)  The Commissioner responds that substantial evidence supports the ALJ's findings and that Plaintiff's arguments are simply a request for the Court to reweigh the evidence.  (ECF Doc. 12, pp. 14-15.)

The Sixth Circuit has explained that an assistive device "cannot be considered an exertional limitation" in an RFC if the device "was not a necessary device for claimant's use." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002).  Under SSR 96-9p, an ALJ may only find a hand-held assistive device to be medically necessary where the record contains "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  SSR 96-9p, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

Under the first SSR 96-9p requirement, the record must contain medical documentation of "the need for a hand-held assistive device to aid in walking or standing," not simply notations

that a claimant was observed using an assistive device. 61 Fed. Reg. at 34482; *see Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 WL 2988346, at *8 (N.D. Ohio Mar. 22, 2023) (collecting cases) ("[T]he fact that various physicians noted Mr. Barnes' use of a cane or a walker does not establish that an assistive device was medically necessary for purposes of SSR 96-9p."); *Phillips v. Comm'r of Soc. Sec.*, No. 5:20-CV-01718-CEH, 2021 WL 5603393, at *10 (N.D. Ohio Nov. 30, 2021) ("Although various medical records note that Claimant presented at appointments using a cane, these notations do not meet the requirements of SSR 96–9p.").

Under the second SSR 96-9p requirement, the record must contain medical documentation "describing the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)," not simply a prescription for 1an assistive device. 61 Fed. Reg. at 34482; *see Barnes*, 2023 WL 2988346, at *8 (collecting cases). This is consistent with the case law from multiple other circuits, which have found that SSR 96–9p requires an "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary." *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012); *see also Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) ("[T]he legal issue does not turn on whether a cane was 'prescribed' for Spaulding, but whether a cane was 'medically required.'); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (finding prescription and references to use of cane without discussion of medical necessity to be insufficient to show medical necessity).

Here, Mr. Baez-Cruz argues that "the need and use of a rollator/walker was established in the record[.]" (ECF Doc. 9, p. 21.) In support, he points to the following evidence:

- Dr. Hazen prescribed a walker in April 2023 (*id.* (citing Tr. 1026));

29

- Testimony that Mr. Baez-Cruz experienced burning, numbness, and cramping in his legs and arm and used a walker whenever he had to stand or leave the house (*id.* (citing Tr. 68-69)); and

- Treatment notes indicating that Mr. Baez-Cruz was observed using a walker or rollator in September, October, and December 2023 (*id.* (citing Tr. 1026, 1934, 1944); ECF Doc. 13, p. 4 (citing Tr. 1037, 1937, 2278)).

Considering this evidence, Mr. Baez-Cruz asserts that the ALJ erred by not finding an assistive device medically necessary and by not adopting an RFC that required an assistive device.  (ECF Doc. 9, p. 22.)  He argues that "a rollator/cane was needed for weakness and pain" and given the VE testimony that need for a cane would preclude employment, "failure to include the need for the documented and established walker in the RFC was harmful error."  (*Id.*)

Before adopting the relevant RFC, the ALJ considered: Mr. Baez-Cruz's allegations of need to use a walker and problems with walking, standing, postural activities, and climbing (Tr. 24); the absence of any reported use of ambulatory aids in his Function Report (Tr. 33); the objective findings in his treatment records, including a normal range of motion, full weight bearing, normal sensation, reflexes, and coordination, no neurological, focal, or motor deficits, limping or antalgic gait at times, good gait at times, and observed use of a cane only rarely (Tr. 34-37); his reports to providers of back, neck, and leg pain (*id.*); the medical opinion of state agency medical consultant Dr. Siddiqui, which did not include need for an assistive device (Tr. 42-43); and the medical opinion of treating physician Dr. Mendoza, who opined that Mr. Baez-Cruz needed an ambulatory aid (Tr. 44-45).  Having considered all of that evidence, the ALJ provided the following explanation for not including need for an assistive device in the RFC:

> The record does not support that an assistive device such as a walker or cane is medically necessary. <u>In the Function Report (03/23/22), he did not report use of any ambulatory aids</u> []. <u>He was observed with a cane rarely [], and otherwise not observed with any ambulatory aids</u>. He was observed with a limping gait, full weight-bearing, no assistive device []; an antalgic gait []; and with antalgic gait limping []. His gait was noted as slow and antalgic in September of 2022 []. He underwent gait training/PT with findings of an antalgic gait and lower extremity

30

weakness in September of 2023 and November of 2023 []. <u>Although claimant was prescribed a walker, it was prescribed immediately following surgery</u> []. Exam findings throughout the period also note that his gait was "good" []; and <u>he was not observed using any ambulatory aids or devices throughout the record generally, with the exception of immediately following surgeries. He also denied gait issues and ambulatory aid use at times throughout the record []. While the claimant has an antalgic gait with a limp, at times throughout the record, the evidence does not suggest that a cane or other ambulatory aid is medically necessary.</u> Thus, this portion of the claimant's allegations is not entirely consistent with the record.

(Tr. 38-39 (citing Tr. 398-99, 464, 475, 489, 515, 520, 685, 696, 699, 721, 748, 776, 782, 1045, 1370, 1389, 2866) (emphasis added).)

The medical evidence supports the ALJ's findings.  Mr. Baez-Cruz was not generally observed to use an assistive device except for—as the ALJ noted—a period following surgeries in March 2023 (Tr. 736) and September 2023 (Tr. 1023-24).  (*See* Tr. 749, 1026, 1944, 2866 (appointments in the post-operative period at which Mr. Baez-Cruz was observed with or reported using an assistive device).)  Physical examinations often noted normal or "good" gait (*see, e.g.*, 492, 520, 721-22, 776, 782, 1370, 1389) as well as normal strength, range of motion, and muscle tone throughout (*see, e.g.,* Tr. 463-64, 492, 540, 776, 2245, 2626).  Abnormal findings were generally limited to limping or antalgic gait at times, decreased range of motion in the lumbar spine or right hip, occasional numbness or paresthesia in the extremities, and mild joint tenderness.  (*See, e.g.*, Tr. 464, 492, 522-23, 538, 748, 739, 776, 1045, 1933-35, 2866.)  The ALJ also noted the lack of any indication in Plaintiff's Function Report that he used an assistive device (Tr. 33 (citing Tr. 398-99)) and accurately summarized the relevant medical evidence (Tr. 34-37).  The undersigned therefore concludes that the ALJ's finding that an assistive device was not medically necessary is supported by substantial evidence.

Plaintiff's conclusory argument that the record "clearly established that [he] met the criteria of [SSR 96-9p]" does not change this analysis.  Turning to the first requirement under

31

SSR 96-9p—the need for medical documentation of "the need for a hand-held assistive device to aid in walking or standing," 61 Fed. Reg. at 34482—the evidence cited by Plaintiff as meeting this requirement is limited to a post-surgery prescription and observations in a handful of treatment notes that Mr. Baez-Cruz used an assistive device, most of which were in the months follow his March 2023 and September 2023 surgeries. (*See* ECF Doc. 9, p. 21 (citing Tr. 1026, 1934, 1944); ECF Doc. 13, p. 4 (citing Tr. 1037, 1937, 2278).) Such evidence is insufficient to show medical necessity under SSR 96-9p. *See Barnes*, 2023 WL 2988346, at *8 (collecting cases) ("[T]he fact that various physicians noted Mr. Barnes' use of a cane or a walker does not establish that an assistive device was medically necessary for purposes of SSR 96-9p."). Thus, the ALJ did not err in failing to find otherwise.

Turning to the second requirement under SSR 96-9p—the need for medical documentation "describing the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)," 61 Fed. Reg. at 34482—none of the records cited by Plaintiff include the necessary information describing how and when he needs an assistive device. He cites only treatment records noting that he was prescribed and/or observed using an assistive device. Accordingly, the undersigned finds the ALJ did not "fail[] to comply with the appropriate Social Security Ruling," (ECF Doc. 13, p. 4), when she found the record did not establish that an assistive device was medically necessary.

For the reasons set forth above, the undersigned concludes that Mr. Baez-Cruz has not met his burden to show that the ALJ lacked the support of substantial evidence in finding that an assistive device was not necessary or failed to comply with the requirements of SSR 96-9p. Accordingly, the undersigned finds the fourth assignment of error is without merit.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

June 18, 2026

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).